[811 NYS2d 47]

MADISON AVENUE LEASEHOLD, LLC, Appellant, v MADISON BENT-
LEY ASSOCIATES LLC et al., Respondents.

First Department, March 14, 2006

### APPEARANCES OF COUNSEL

*Kucker & Bruh, LLP*, New York City (*Nativ Winiarsky* and *Patrick K. Munson* of counsel), for appellant.

*Seymour I. Hurwitz*, New York City (*David Vanderpool* of counsel), for respondents.

### OPINION OF THE COURT

Tom, J.P.

Defendant Madison Bentley Associates (Bentley) is the assignee of a 10-year lease between plaintiff landlord and nonparty MMC Madison LLC, commencing June 15, 2000, for commercial space to be used to sell luxury automobiles.[1] The lessee's payment of rent was guaranteed by the individual defendants under a contemporaneously executed instrument. The guaranty recites that, "in the event Tenant shall not have been in monetary

---

1. The lease is signed by defendant Brian Miller as managing member of MMC Madison LLC.

default under the Lease at any time during the first three (3) years of the Lease, this Guaranty and Guarantor's [*sic*] obligations hereunder shall cease and terminate upon the third (3rd) anniversary of the Commencement Date." It is uncontroverted that Bentley quit the premises and ceased payment of rent on September 29, 2003, some three years and three months after the commencement date of the lease.

At issue on this appeal is whether Bentley was in default of its lease with plaintiff so as to continue in effect the guaranty of the corporate tenant's performance made by its principals, defendants Arthur Miller and Brian Miller. By its terms, continuation of the guaranty is predicated on the tenant's "monetary default" during the first three years of the lease term. It is plaintiff's contention that a series of defaults of the lease's timely payment covenant occurred because Bentley habitually paid rent within the 20-day grace period prescribed in the lease,[2] rather than "in advance on the first day of each calendar month," as specified in the lease rider, purportedly fulfilling the guaranty's termination condition. However, even accepting, for the sake of argument, that a "default" under the lease is synonymous with a "monetary default" under the lease rider and guaranty,[3] landlord's acceptance of the tendered rent with knowledge of the lease violation extinguishes the default as a matter of law. Moreover, landlord's practice of accepting the proffered rent payments, without protest, over a period of three years, constitutes a course of conduct effecting a waiver of the timely payment covenant. Thus, we conclude that any asserted default was extinguished, that the conditions necessary to subject the guarantors to liability were never met, that the condition for extending the guaranty was never fulfilled and that the guaranty ceased to have any force and effect upon the third anniversary of the lease.

---

**2.** While the provisions of the lease rider could be read to the contrary, paragraph 17 of the printed lease agreement provides "if tenant defaults in . . . the covenant for the payment of rent . . . and if tenant shall not have diligently commenced curing such default within such twenty (20) day period . . . then owner may serve a written three (3) day notice of cancellation of this lease upon tenant." Regardless of landlord's present position, as urged by the dissent, that there is no 20-day grace period, we find that the parties have acknowledged such a grace period pursuant to paragraph 17 of the lease, by landlord's repeated acceptance of rent within the 20-day period over the course of three years without a single protest.

**3.** The guaranty provides that any terms "defined in the Lease shall have the same meanings when used in this Guaranty." The term "monetary default," while used in the lease rider, is not expressly defined in that document.

In granting the individual defendants' motion to dismiss the complaint as against them, Supreme Court held that the timely payment covenant of the lease had been waived and that any default was de minimis. The court reasoned that the purpose of the parties' collateral agreement was to guarantee payment during the first three years of the lease term, the same time period during which Bentley received a rent subsidy from Rolls-Royce. Having failed to seek redress under the lease, the court concluded that landlord "waived any alleged defaults which occurred through Madison Bentley's adherence to its unchallenged payment practices during the first three years of its lease."

On appeal, plaintiff takes the same position advanced before the motion court, that Bentley's repeated failure to tender rent on or before the first of each month constitutes a series of defaults under the lease covenant that requires payment to be made on the first day of each month.[4] Landlord argues that its tenant was therefore "in monetary default under the Lease" during the first three years of the lease term, that the condition for extension of the guaranty was fulfilled and that the individual defendants are liable under their guaranty for the rent payable for the balance of the lease term.

The disputed default provision of the lease is hardly a model of clarity. However, the parties agree that the term "monetary default," as used both in the guaranty and in the rider to the lease, embraces a default in the payment of rent (although they dispute precisely when a "default" represented by late payment ripens into "monetary default" so as to subject the guarantors to liability). They also agree that the only basis for enforcement of the guaranty beyond June 15, 2003 is the tenant's "monetary default" during the first three years of the lease (however that term might be construed). Finally, because the extinguishment date of the guaranty precedes by several months the tenant's breach of the lease upon quitting the premises, there is no dispute that the liability of the individual defendants for the balance of the rent due is solely dependent on the tenant's "monetary default" under the lease during the first three years.

To identify what conduct constitutes a default in the payment of rent, landlord relies exclusively on the terms of the lease, concluding that "default" encompasses any period during which the rent remained unpaid after the due date on the first of each

---

4. The provision is contained in a standard form of store lease published by the Real Estate Board of New York, Inc.

month. Even though any such default was ultimately cured by payment of rent within the grace period, landlord maintains that the tenant's technical violation of the lease's timely payment covenant is sufficient to fulfill the guaranty's extension provision.

The individual defendants argue that landlord's conduct in repeatedly accepting late rent payments constitutes a waiver of the timely payment covenant of the lease, as Supreme Court found. They contend that the interpretation propounded by landlord would effectively negate the three-year limitation provision of their guaranty.

Landlord responds that waiver is inapplicable to the facts of this case because there is no need to invoke the courts' equitable powers. It notes that, because its tenant voluntarily removed from the premises, no forfeiture of the leasehold is at stake. Therefore, it contends, it is unnecessary to apply the waiver doctrine to avoid the loss of a valuable leasehold interest.

"A waiver is the voluntary abandonment or relinquishment of a known right. It is essentially a matter of intent which must be proved" (*Jefpaul Garage Corp. v Presbyterian Hosp. in City of N.Y.*, 61 NY2d 442, 446 [1984]). Waiver is certainly employed by the courts as a tool of equity to prevent forfeiture (*e.g. Baker v Norman*, 226 AD2d 301 [1996], *lv dismissed* 88 NY2d 1040 [1996]; *Dellicarri v Hirschfeld*, 210 AD2d 584 [1994]). However, contrary to plaintiff's contention, its application is not restricted to the exercise of the courts' equitable powers but extends to the interpretation of contracts generally (*e.g. Computer Strategies v Commodore Bus. Machs.*, 105 AD2d 167, 174 [1984] [dealership agreement]).

This Court applied the waiver doctrine to a dispute over the terms of a guaranty in *Bank Leumi Trust Co. of N.Y. v Block 3102 Corp.* (180 AD2d 588, 590 [1992], *lv denied* 80 NY2d 754 [1992]), stating:

> "a contracting party may orally waive enforcement of a contract term notwithstanding a provision to the contrary in the agreement (*Alside Aluminum Supply Co. v Berliner*, 32 AD2d 731). Such waiver may be evinced by words or conduct, including partial performance (*see, Rose v Spa Realty Assocs.*, 42 NY2d 338, 343-344). . . . Waiver is unilateral and, 'not being a binding agreement, can, to the

extent that it is executory, be withdrawn, provided the party whose performance has been waived is given notice of withdrawal and a reasonable time after notice within which to perform' (*Nassau Trust Co. v Montrose Concrete Prods. Corp.*, 56 NY2d 175, 184)."

The same criteria are pertinent to deciding the instant controversy.

It is well established that "[w]hen rent is accepted with knowledge of particular conduct which is claimed to be a default, the acceptance of such rent constitutes a waiver by landlord of the default" (*Atkin's Waste Materials v May*, 34 NY2d 422, 427 [1974], citing *Woollard v Schaffer Stores Co.*, 272 NY 304, 312 [1936] and *Murray v Harway*, 56 NY 337 [1874]), unless landlord has promptly demanded correction of the disputed conduct, in which case waiver is a question of fact (*see Jefpaul Garage*, 61 NY2d at 448-449). Any provision of a contract is subject to waiver, particularly a provision requiring timely payment (*Snide v Larrow*, 93 AD2d 959, 959 [1983] ["knowledgeable acceptance of late payments over an extended period of time . . . establishes the necessary elements to constitute a waiver of the right to insist upon timely payments" (citing *Ford v Waxman*, 50 AD2d 585 [1975])], *affd* 62 NY2d 633 [1984]; *see* Calamari and Perillo, Contracts § 11.31, at 444 [4th ed]). The principle is equally applicable to a lease (*see East 4th St. Garage v L.B. Mgt. Co.*, 172 AD2d 292, 292 [1991], citing *61 E. 72nd St. Corp. v Zimberg*, 161 AD2d 542 [1990]). The inclusion of a merger clause in an instrument is no bar to waiver because "a contractual provision against oral modification may itself be waived" (*Rose v Spa Realty Assoc.*, 42 NY2d 338, 343 [1977], *supra*). As here, a no-waiver clause is waived by the acceptance of rent (*TSS-Seedman's, Inc. v Elota Realty Co.*, 72 NY2d 1024, 1027 [1988]; *see also Lee v Wright*, 108 AD2d 678, 680 [1985] ["parties may waive a 'no-waiver' clause"]).

Because this dispute concerns the performance of obligations under a lease, the legal rights of the parties must be construed in light of well-settled landlord-tenant law, which clearly establishes waiver under the facts of this case. It is undisputed that, during its tenancy, Bentley engaged in a practice of making late rent payments, generally within 10 days (23 payments) and otherwise, with a single exception, within 20 days of the due date. Landlord accepted all late payments without protest and without taking any action. No proceedings were instituted

to recover past-due rent, and no notice demanding timely payment was ever sent to Bentley. In fact, landlord did not raise the timeliness of Bentley's rent payments until after the third anniversary of the lease, when in early 2004, it commenced this action to recover the rent due for the remainder of the lease term. The course of conduct of the parties to the lease clearly establishes waiver of its timely payment provision as a matter of law.

Out of simple fairness, a party that has repeatedly waived a condition of performance, particularly the timeliness of payment, is required to give notice that its waiver has been withdrawn before demanding strict compliance with the condition (*see Bank Leumi Trust Co.*, 180 AD2d at 590; Calamari and Perillo, Contracts § 11.32, at 447-448 [4th ed]). This requirement simply recognizes the reasonable expectations that arise from a course of conduct. This Court applied the rule to the relationship of landlord and tenant nearly a century ago in *Montant v Moore* (135 App Div 334, 341 [1909]), stating:

> "where under a lease in which payment of the rent is required upon a day certain the parties by a course of conduct extending for years have acquiesced in a method by which the rent is to be paid, the provision for payment in the original contract is so far waived as to prevent a claim that a failure to pay upon the day named is a breach of the condition until the lessee has notice of the fact that such a custom will not in the future be continued and payment is required upon the day named in the contract."

Having failed, over the course of three years, to give Bentley any notice that timely payment of rent would be required, landlord may not now insist that its tenant's failure to strictly comply with the timely payment condition of the lease constitutes a default.

Plaintiff would have this Court disregard these well-settled legal principles in favor of the strained interpretation it places upon the governing lease. In landlord's narrow view, a "default" is defined by the peculiar language of its lease, divorced from the concepts of default and waiver well entrenched in the law of contracts and leaseholds. There are several fatal deficiencies in this position.

"Parties who engage in transactions based on prevailing law must be able to rely on the stability of such precedents" (*Holy*

*Props. v Cole Prods.*, 87 NY2d 130, 134 [1995]). While words are generally assigned their ordinary meaning, where a word has attained the status of a term of art and is used in a technical context (here, a lease), the technical meaning is preferred over the common or ordinary meaning (Calamari and Perillo, Contracts § 3.13, at 155 [4th ed]).[5] The law is so well settled with respect to both the meaning and the legal ramifications of a "default" under a lease that plaintiff bears an insurmountable burden to demonstrate that the parties to the guaranty intended to ascribe a different meaning to the term.

It must be emphasized that the document subject to interpretation is a standard form lease. To construe conduct that the law does not consider a default to somehow constitute a default under the terms of this lease would cast doubt on the meaning of the term in all leases, removing them from the application of well-established landlord-tenant law. Even were we so inclined, this Court would not confound well-settled principles governing leaseholds for the sake of enforcing a mere collateral agreement.

Yet another consideration in interpreting the guaranty is the reasonable expectations of the parties and the business purpose to be served by their contract (*Uribe v Merchants Bank of N.Y.*, 91 NY2d 336, 341 [1998]). Besides the common meaning of the language employed, the expectations and purposes of the parties in view of the factual context in which the agreement was made must be considered in interpreting a contract term, with due regard to the parties' sophistication (*id.*; *see also Ace Wire & Cable Co. v Aetna Cas. & Sur. Co.*, 60 NY2d 390, 398 [1983] [insurance policy]). With respect to reasonable expectations, it is axiomatic that the parties to an agreement will interpret the instrument governing their relationship in accordance with existing law (*see 1009 Second Ave. Assoc. v New York City Off-Track Betting Corp.*, 248 AD2d 106, 109 [1998], *lv dismissed* 92 NY2d 947 [1998]).

It is disingenuous to argue that the individual defendants expected their obligations under the guaranty to be extended by a mere technical violation rather than by a material default. Significantly, the condition of the guaranty that obligates them to reimburse landlord for any rent the tenant failed to pay was never activated; all rent due during the relevant three-year pe-

---

**5.** The exception, inapplicable under these circumstances, is where "another intention is established, as where there is a non-technical meaning and one party is a layperson" (*id.*).

riod was fully paid within the grace period. Furthermore, in view of the coextensiveness of the guaranty and the rent subsidy received by Bentley from Rolls-Royce, it is reasonable to conclude that the parties intended the term of the guaranty to be limited to three years unless the guarantors' obligations thereunder were actuated by landlord's tangible loss, whether due to the failure to receive payment of outstanding rent or some other out-of-pocket expense. Finally, though not essential to the disposition of this appeal, the incorporation of a grace period during which no action would be taken as the result of the tenant's failure to make a rent payment indicates that the parties did not intend immediate legal consequences to ensue as the result of a rent payment made after the due date.

Another lease provision affording Bentley free use of the premises for the first two months is similarly conditioned on the absence of default under the lease. It states, "provided this Lease shall be in full force and effect and Tenant shall not be in default hereunder beyond any applicable notice and grace periods, the fixed rent shall abate at the rate of $36,066.67 per month for a period of two (2) months from and after the Commencement Date." It is clear from this language that any default is not material to the abatement until the expiration of "any applicable . . . grace period[ ]." Landlord advances no reason why a default in the payment of rent should entail immediate adverse consequences for the tenant, even though it was ultimately cured (by acceptance of late payment without protest) and waived (by repeated acceptance of late rent over a period of years).

"It is the rare writing that requires no interpretation" (*Bensons Plaza v Great Atl. & Pac. Tea Co.*, 44 NY2d 791, 792-793 [1978]). In construing an agreement, "not merely literal language, but whatever may be reasonably implied therefrom must be taken into account" (*Sutton v East Riv. Sav. Bank*, 55 NY2d 550, 555 [1982]). A reasonable construction of the termination provision is that the guaranty will continue only if, during the first three years of the lease, landlord has been required to seek payment from the tenant for a breach of the lease (not necessarily one involving the payment of rent). It is undisputed that, during this time period, landlord was subject to no impending financial loss that required resort to its remedies, either against its tenant or the guarantors.

Similarly unavailing to landlord's attempt to avoid the consequences of waiver is its resort to the terms of the guaranty

itself. Plaintiff again employs a strained interpretation of the language of the instrument to argue that its waiver of timely payment of rent under the lease does not affect its right to hold the individual defendants liable under their guaranty. Plaintiff relies on certain "no waiver" provisions of the guaranty, which recite that the individual defendants' obligations "shall in no wise be terminated, affected, diminished or impaired by reason of . . . the failure to assert . . . any of the rights or remedies reserved to Landlord pursuant to any provisions of the Lease," and that the guarantors' "liability . . . shall in no way be affected . . . by reason of any extension of time that may be granted by Landlord to Tenant." Plaintiff reasons that because waiver constitutes the "failure to assert . . . rights or remedies reserved to Landlord [under] the Lease," and because waiver resulted from an "extension of time" to pay the monthly rent, such waiver cannot be the basis for the termination of the individual defendants' obligations under the guaranty.

This reasoning, adopted by the dissenter, is flawed by its attempt to read the guaranty separate and apart from the condition under the lease that gives the guaranty force and effect. Simply put, landlord attempts to read the guaranty without any regard to the condition that must first be satisfied to render it effective, that is, a "monetary default" under the lease. While conceding that "contractual provisions can be waived," the dissent perceives the decisive issue to be not whether landlord waived the right to timely payment under the lease but "whether [landlord] waived any of its rights under the guaranty against the Millers," concluding that the guaranty's "no waiver" provisions insulate landlord from the effect of any waiver of performance under the lease.

A contract of guaranty is subject to the fulfillment of any condition precedent to the liability imposed on the guarantor (*compare American Tobacco Co. v Halle-Perris Trading Corp.*, 212 App Div 627, 629 [1925] [condition precedent], *with American Exch. Irving Trust Co. v Siegel*, 229 App Div 453 [1930] [condition subsequent]). In particular, "[t]he guarantor's liability accrues only after default on the part of the principal obligor" (*Brewster Tr. Mix Corp. v McLean*, 169 AD2d 1036, 1037 [1991], citing *General Phoenix Corp. v Cabot*, 300 NY 87, 95 [1949]). Thus, to establish that the guaranty ever took effect, plaintiff must demonstrate that there was a default on the part of the principal obligor, Bentley. As the Court of Appeals stated in *Hicks v Bush* (10 NY2d 488, 493 n 1 [1962], quoting *Golden v*

*Meier*, 129 Wis 14, 18, 107 NW 27, 29 [1906]), " 'If the condition precedent be not performed, then the contract will never have vitality or become a binding agreement.' "

The condition precedent that must be fulfilled in order to subject the guarantors to liability under the provisions of the guaranty is a "monetary default" under the lease. Furthermore, the guaranty provides that it shall cease on the third anniversary "in the event Tenant shall not have been in monetary default under the Lease at any time during the first three (3) years of the term of the Lease." To determine whether the guaranty ever became effective and whether it remained in effect at the time Bentley vacated the premises, we must look to the lease to determine whether there was a "monetary default" by the tenant. If there was no "monetary default" under the lease, the condition precedent was not fulfilled and the guaranty, together with its "no waiver" provisions concerning landlord's enforcement of its rights and remedies, never had any force and effect. As previously stated, because landlord, by a course of conduct extending over a period of years, waived the tenant's late payment of rent, there was no "monetary default" by the tenant under the lease during the applicable three-year period, the guaranty neither took effect nor was extended, and the guarantors were never subject to its terms and obligations. Once waived, the default in timely payment of rent is extinguished and cannot later be revived, like a phoenix, into a material default for the purpose of extending the period of the collateral guaranty. Thus, the loss sought to be recouped in this action, resulting from a default (vacatur of the premises) that occurred three years and three months after the commencement of the lease, is not recoverable from the individual defendants.

To recapitulate, continuation of the guaranty is predicated solely upon a "monetary default," conceded by all to mean a default in the payment of rent under the lease. The only such default identified by landlord is the failure to make rent payments on the first of each month, not its failure to receive any individual rent payment. Moreover, landlord's consistent acceptance of late rent payments, without protest, constitutes a waiver of the lease provision requiring prompt payment as a matter of law. Thus, there has been no default by the tenant in the payment of rent, and the guaranty expired according to its terms due to the lack of the antecedent "monetary default" under the lease required by the guaranty's extension provision.

Accordingly, the order of the Supreme Court, New York County (Sherry Klein Heitler, J.), entered January 10, 2005,

which granted the cross motion of defendants Arthur Miller and Brian Miller for summary judgment dismissing the complaint to the extent that it alleged their individual liability for breach of a lease between plaintiff and defendant Madison Bentley Associates, and denied, as moot, plaintiff's motion to amend the complaint to add allegations of these individual defendants' personal liability, should be affirmed, without costs.

McGuire, J. (dissenting). I respectfully dissent. Plaintiff Madison Avenue Leasehold, LLC (Madison) entered into a lease with MMC Madison on March 29, 2000 pursuant to which the latter rented a portion of the premises located at 437 Madison Avenue from Madison, the apparent owner of the premises. Defendant Madison Bentley Associates (Bentley) is the assignee of MMC Madison's interests under the lease, which commenced on June 15, 2000 with a term of 10 years. Defendants Arthur Miller and Brian Miller (the Millers), who apparently are principals of Bentley, entered into a separate agreement with Madison (the guaranty) in which they guaranteed various obligations of Bentley under the lease.

The relevant facts are not in dispute. In August of 2003, Bentley sought certain modifications of the lease, including a reduction of rent. Bentley informed Madison that a rent subsidy it had been receiving from another entity, Rolls-Royce and Bentley Motor Cars Inc. (Rolls-Royce), was due to expire on September 30, 2003, and without it Bentley would be compelled to terminate the lease and vacate the premises unless it received a rent reduction and other concessions. No agreement was reached and Bentley vacated the premises on September 29, 2003—more than three years after the commencement of the lease on June 15, 2000—with seven years remaining on its term. Bentley has not paid any rent since it vacated the premises; the Millers have not made any payments under the guaranty.

Madison commenced this action against Bentley and the Millers by filing a summons and verified complaint on January 26, 2004. In its first cause of action for breach of contract, Madison sought to recover from Bentley under the lease and from the Millers under the guaranty. In late May 2004, Madison moved for permission to serve and file an amended complaint; the Millers cross-moved for summary judgment with respect to their liability under the guaranty. The court granted the Millers' cross motion and denied as moot Madison's motion.

Because this appeal turns, or should turn in my view, on the terms of the guaranty, the relevant provisions of the guaranty

merit quotation at some length. First, the Millers, referred to collectively as the "Guarantor,"

> "jointly and severally guarantee to Landlord the full and prompt payment of all rent . . . and the Guarantor hereby covenants and agrees to and with Landlord, that if default shall at any time be made by Tenant in the payment of any rent . . . and if such default shall not be cured within ten (10) days after notice of such default shall have been given to Guarantor, then the Guarantor shall and will forthwith pay such rent to Landlord and any arrears thereof."

Second, the guaranty expressly limited the amount of the guarantor's liability to a specified sum, exclusive of certain additional amounts. Third, the guaranty contained the following contingent expiration provision:

> "Landlord hereby agrees that in the event Tenant shall not have been in monetary default under the Lease at any time during the first three (3) years of the term of the Lease, this Guaranty and Guarantor's obligations hereunder shall cease and terminate upon the third (3rd) anniversary of the Commencement Date."

Fourth, the guaranty, "an absolute and unconditional Guaranty of payment and performance," specifies that it:

> "shall be enforceable against the Guarantor . . . without the necessity for any suit or proceedings on Landlord's part of any kind or nature whatsoever against Tenant, without the necessity of any notice of non-payment, non-performance or non-observance (except as expressly required under the terms of this Guaranty), or . . . of any other notice or demand to which the Guarantor might otherwise be entitled, all of which the Guarantor expressly waives."

Fifth, the guaranty also specifies that:

> "Guarantor hereby expressly agrees that the validity of this Guaranty and the obligations of the Guarantor hereunder shall in no wise be terminated, affected, diminished or impaired by reason of the assertion, or the failure to assert, by Landlord against Tenant of any of the rights or remedies

14

reserved to Landlord pursuant to any provisions of the Lease."

Sixth, the guaranty goes on to provide that:

"This Guaranty shall be a continuing Guaranty, and the liability of the Guarantor hereunder shall in no way be affected, modified or diminished by reason of . . . any modification or waiver of or change in any way of the terms, covenants, conditions or provisions of the Lease by Landlord and Tenant, or by reason of any extension of time that may be granted by Landlord to Tenant, or by reason of any dealings or transaction or matter or thing occurring between Landlord and Tenant . . . ."

The motion court recognized that by its terms the guaranty terminated on the third anniversary of the commencement date of the lease but only, as the guaranty expressly provides, "in the event Tenant shall not have been in monetary default under the Lease at any time during the first three (3) years of the term of the Lease." The court also recognized both that the lease defines a "default" as the tenant's failure to "fulfil[l] any of the covenants of this lease including the covenants for the payment of rent or additional rent" and that rent was due on the first day of each month. In addition, the court recognized that the Millers had conceded that Bentley had repeatedly failed to make rent payments by the first of the month.

Nonetheless, the court concluded that any default by Bentley in its covenant to pay rent by the first of the month was "de minimis," that Madison had acquiesced in the late rental payments and thereby waived any claim of breach, and that Madison had deprived Bentley of an opportunity to cure any breach by "choosing . . . to deem . . . Bentley in breach of the lease *after* the three-year term of the . . . Guaranty had presumably expired." On the basis of this rationale—waiver by course of conduct—the court concluded at least implicitly that as a matter of law the guaranty had expired on the third anniversary of the commencement date, thus rendering nugatory Madison's claim against the Millers. The court believed as well that the "plain intent" of the guaranty was "to effectuate its end after three years—the same period for which . . . Bentley was receiving a rent subsidy from Rolls-Royce." Presumably, the court believed that its conclusion that the guaranty had expired thus was consistent with this "plain intent."

The majority errs in essentially adopting the reasoning of the motion court. Adoption of this waiver analysis will expose

contracting parties to the very uncertainty risks and attendant costs that prudent businesses typically seek to avoid by entering into written contracts defining their rights and responsibilities. It will also expose the court system to what it does not need— additional and, in my judgment, baseless litigation. Indeed, under this analysis, Madison and all similarly situated contracting parties are encouraged to go to the time and expense of serving notices of default for any failure fully to perform as soon as legally permissible, regardless both of whether they have received assurances that payment or other performance is imminent and of how relatively inconsequential the particular default may be under the particular circumstances. Only by so proceeding, after all, can they gain some measure of comfort that valuable rights for which they bargained will not be deemed to have been waived. The parties upon whom such notices are served also will incur costs. Presumably, prudent parties on both sides of the notices will consult with counsel. Rather than induce contracting parties to travel down the less than sunny path to litigation at the drop of a hat, the law should encourage accommodation and reasonable forbearance. To say the least, no net gain results (except possibly to lawyers) from the approach of the majority and the motion court.

As Madison correctly argues, this waiver analysis ignores the economic realities of the lease in light of the guaranty. The guaranty effectively shifted the ultimate risk of Bentley's non-performance of the obligation to make rent payments from Madison to the Millers. Accordingly, Madison had no economic reason to notify Bentley of Bentley's own habitually late payments during the very period in which Madison allegedly waived its rights by failing to do so. To insist on pain of waiver that Madison formally advise Bentley of what it already knew makes little sense. On the facts of this case, in particular, that the Millers are Bentley's principals, the waiver analysis is all the more confounding, for it reduces to this: Madison waived the rights it bargained for under the guaranty by failing formally to belabor the obvious both to Bentley and the Millers.

It is axiomatic that in the absence of ambiguity a contract should be enforced according to its terms (*Vermont Teddy Bear Co. v 538 Madison Realty Co.*, 1 NY3d 470, 475 [2004]). This familiar rule has "special import in the context of real property transactions, where commercial certainty is a paramount concern, and where . . . the instrument was negotiated between sophisticated, counseled business people negotiating at

arm's length" (*id*. [internal quotation marks deleted and citation omitted]). Furthermore, "[i]n the absence of any ambiguity, we look solely to the language used by the parties to discern the contract's meaning" (*id*.).

To say that the unequivocal language of the guaranty is inconsistent with Madison having waived its right to claim a default under the lease (thereby terminating the guaranty, to boot), would be to engage in understatement. The guaranty all but shouts out that no action by Madison under the lease can affect the Millers' obligations under the guaranty. Thus, for example, the guaranty expressly states that the "obligations of the Guarantor hereunder shall in no wise be terminated, affected, diminished or impaired by reason of the assertion, or the failure to assert, by Landlord against Tenant of any of the rights or remedies reserved to Landlord pursuant to any provisions of the Lease." The guaranty is enforceable "without the necessity for any suit or proceedings on Landlord's part of any kind or nature whatsoever against Tenant, [and] without the necessity of any notice of non-payment." Indeed, even if the parties to the lease had executed a document waiving rights under the lease, the Millers' obligations would be unaffected. As the guaranty expressly states, the guarantor's obligations "shall in no way be affected, modified or diminished by reason of . . . any modification or waiver of or change in any way of the terms, covenants, conditions or provisions of the Lease by Landlord and Tenant."

To be sure, as the Millers argue, a late rent payment would not by itself authorize Madison to terminate the lease. Rather, Madison would have been required to give written notice of the payment default and Bentley then would have had the benefit of a period in which to "cur[e] . . . such default." The language of the lease in this regard, however, serves only to vindicate Madison's position. The lease thus distinguishes (and, given that it is a lease between sophisticated parties, this Court should conclude it carefully distinguishes) between a default and the legal consequences of a default.

For this reason, Bentley's position is fatally undercut rather than supported by its insistence, as the motion court apparently found, that "rent was always paid by the twentieth (20th) day of the month, and on twenty-three (23) occasions was paid by the tenth (10th) day of the month." Bentley's concededly late payments conclusively establish rent payment defaults under the lease. These defaults, in turn, just as conclusively establish

under the guaranty both: (1) that Bentley was "in monetary default under the lease" at various times (the guaranty requires only such a default "at any time") "during the first three (3) years of the term of the Lease," and (2) that the guaranty thus did not "cease and terminate upon the third (3rd) anniversary of the Commencement Date."

Because the guaranty expressly and repeatedly specifies that the obligations of the guarantor are independent of the terms of the lease, the Millers' position is not advanced by decisions to the effect that the provisions of contemporaneously executed agreements should be construed together (*e.g. National Union Fire Ins. Co. of Pittsburgh, Pa. v Christopher Assoc.*, 257 AD2d 1 [1999]). Even when construed together, as they must be if only to ascertain the meaning of the term "monetary default" in the guaranty, nothing in the lease renders at all ambiguous the unequivocal language of the guaranty. For the same reason, the principle that "an uncompensated surety's obligation is construed *strictissimi juris* in the surety's favor" (*Bankers Trust Hudson Val., N.A. v Christie*, 68 AD2d 969, 969 [1979], *adhered to on rearg* 72 AD2d 614 [1979]) does not help the Millers' cause. Under a strict reading of the contract, their guaranty was not terminated.

Nor can this Court look to extrinsic evidence ostensibly bearing on the "plain intent" of the guaranty. The lack of ambiguity in the guaranty precludes Bentley from offering any such evidence and this Court from considering it (*South Rd. Assoc., LLC v International Bus. Machs. Corp.*, 4 NY3d 272, 278 [2005]). To the extent Bentley urges that the only conceivable intent of the parties was to secure Madison's right to receive rent for three years and only three years, it is not persuasive. No flight of imagination is needed to appreciate that Madison reasonably could have concluded that timely compliance by Bentley during the first three years would provide it with a substantial degree of security that Bentley could be trusted to perform during the ensuing seven years. Conversely, the failure of Bentley so to comply would increase Madison's risk and lead it to seek the additional hedge of a continuing guaranty from the Millers.

The majority's "find[ing]" that by their conduct "the parties have acknowledged [a 20-day] grace period" is factually and legally insupportable. Madison has *never* acknowledged any

such grace period.[1] Whatever the parties to the lease (the Millers are not among them) may have acknowledged is beside the point in any event. In the guaranty, the Millers agreed that their obligations would not be affected either by any waiver by Madison of its rights against Bentley under the lease or by any course of conduct between Madison and Bentley.

If by the term "grace period" the majority means a period of time during which rent payments are timely, the relevant provisions of the lease afford no support. In fact, they not only can be "read to the contrary," they cannot reasonably be read to provide *any* such grace period. Paragraph 40 of the lease (set forth in the "Rider" to the lease dated March 29, 2000) provides as follows: "Fixed rent shall be payable in equal monthly installments in advance on the first day of each calendar month, without notice or demand, and without setoff or deduction whatsoever." Pursuant to paragraph 17 (denominated "Default") of the lease, as amended by the "Attachment" to the lease (also dated March 29, 2000), Madison was given the right to terminate the lease under certain circumstances. For certain specified defaults, Madison was given the right to terminate the lease by serving "a written three (3) day notice of cancellation" upon Bentley if Bentley "shall not have diligently commenced curing such default within such twenty (20) day period." For other specified defaults, including "a default in the payment of fixed rent," paragraph 4 of the Attachment specifies a seven-day period. Moreover, paragraph 4A of the Attachment provides that

> "in the event that a default in the payment of fixed rent . . . shall remain uncured after the expiration of the aforesaid seven (7) day period, [Madison] may not serve the aforementioned written three (3) day notice unless and until [Madison] shall have served a second notice of such monetary default, and such monetary default shall remain uncured for three (3) days after [Madison] shall have served such second notice."

At least three conclusions follow from these provisions. First, there is no support at all for the proposition that the lease docu-

---

**1.** To the contrary, its position is and always has been that the lease unequivocally provides that fixed rent is due "in advance on the first day of each calendar month." Indeed, apart from the fact that it has never conceded or acknowledged otherwise, in its reply brief Madison quotes the relevant language from the lease documents and goes on to conclude (correctly, in my view) that "[t]here is no . . . 'grace period' of twenty . . . days as alleged by [Defendants-]Respondents or [] any grace period."

ments provided Bentley with a grace period of 20 days with respect to its obligation to pay fixed rent. Second, there is no support at all for the proposition that the lease documents provided Bentley with a grace period of seven days with respect to its obligation to pay fixed rent. To the contrary, fixed rent was made due "in advance on the first day of each calendar month," and only Madison's right to cancel the lease for such a default was circumscribed by, among other things, a seven-day period in which Bentley could cure such a default and thereby avoid cancellation. That Madison did not have the right to cancel for seven or more days after a failure by Bentley to meet its obligation to pay does not obliterate or even affect Bentley's obligation to pay "on the first day of each calendar month." Put differently, Bentley's right to avoid cancellation for late rent payments under specified circumstances cannot be transformed into a right to make late rental payments.[2]

Third, the lease provisions carefully and unmistakably distinguish between a "default" in Bentley's obligations (including the obligation to pay rent and other "monetary default[s]") and the legal consequences of such defaults. By its express terms, the guaranty terminates on the third anniversary of the lease only "in the event Tenant shall not have been in monetary default under the Lease at any time during the first three (3) years of the term of the Lease." By its own admission, Bentley was repeatedly and habitually in default under the lease of its obligation to pay rent in a timely fashion (i.e., it repeatedly and habitually committed "monetary default[s]"). Accordingly, the Millers can avoid their obligations under the guaranty only if the term "monetary default" means something different in the guaranty than it does in the lease. Not only is there no reason in logic or common sense to give the term a different meaning in the guaranty, to do so is contrary to law (*see e.g. National Union Fire Ins. Co., supra*). Indeed, as the majority recognizes, the guaranty provides that terms "defined in the Lease shall

---

2. The specific provisions of paragraphs 4 and 4A of the Attachment (specifying an initial seven-day cure period and a subsequent three-day cure period) for a default in Bentley's obligation to make timely rent payments control over the general provisions of paragraph 17 of the lease (*see Waldman v New Phone Dimensions*, 109 AD2d 702, 704 [1985], *appeal dismissed* 65 NY2d 784 [1985]). In any event, whether the lease provides for a 20-day cure period or a shorter period is of no moment. The lease provides unequivocally that rent is due "on the first day of each calendar month," not "on the first day of each calendar month or at any time prior to the expiration of the period or periods in which tenant may cure such a default."

have the same meanings when used in this Guaranty." Under the very heading "Default," paragraph 17 of the lease effectively defines the term "default" as a failure by the tenant in "fulfilling any of the covenants of the lease including the covenants for the payment of rent." Particularly given this provision, there is nothing mysterious or ambiguous about the meaning of the term "monetary default."[3]

Moreover, the guaranty also distinguishes between a default in the payment of rent and the consequences of such a default. It provides, after all, that "if default shall at any time be made by Tenant in the payment of any rent . . . and if such default shall not be cured within ten (10) days after notice of such default shall have been given to Guarantor, then Guarantor shall and will forthwith pay such rent to Landlord . . . ."

The majority attempts to eke some support for its position from a provision in the lease granting a rent abatement to Bentley during the first two months of the lease provided that, inter alia, Bentley "shall not be in default hereunder beyond any applicable notice and grace periods." In the first place, as demonstrated, the lease does not provide any grace period with respect to Bentley's covenant to pay fixed rent "in advance on the first day of each calendar month." Second, as the majority acknowledges, the effect of the abatement provision is to relieve Bentley of any obligation to make fixed rent payments in the first two months. Obviously, Bentley could not commit a default by failing to pay zero dollars in advance on the first day of the first two months. For this additional reason, the defaults to which the "any applicable . . . grace periods" language refers cannot possibly include a default in the covenant to pay fixed rent "in advance on the first day of each calendar month." Third, the legal consequences under the lease of a default are in any event irrelevant. What is relevant are the legal consequences under the guaranty of a default by Bentley "at any time" of its obligation to pay rent.

The majority dismisses Bentley's repeated failures to pay rent in a timely fashion as a "technical violation." The short and complete answer to that is the one given in *Fifty States Mgt. Corp. v Pioneer Auto Parks* (46 NY2d 573 [1979]). As the Court of Appeals stated,

---

**3.** To the contrary, the language quoted above in paragraph 4A of the Attachment employing the term "monetary default" also makes clear what is obvious in any event: a "monetary default" on account of a late rent payment can and does occur without regard to whether Madison can or does avail itself of the prescribed remedies for such a "monetary default."

"[a] covenant to pay rent at a specified time, however, is an essential part of the bargain as it represents the consideration to be received for permitting the tenant to remain in possession of the property of the landlord. Often the landlord relies on timely payment of rent to meet its own outstanding obligations, such as a mortgage on the demised premises" (*id.* at 578).

The majority's reliance on the supposed "technical" nature of Bentley's repeated violations is ironic as well as erroneous. After all, the majority insists that a "technical meaning is preferred over the common or ordinary meaning" of the term "default" in the guaranty. Thus, in virtually the same breath the majority both dismisses one of Madison's key arguments as based on a technicality and insists that Madison is bound by a technicality.

Apart from this contradiction, the "technical meaning" the majority would give to the term "default" is as unclear as the "well settled" law upon which the majority claims to rely. Apparently, however, the majority believes the term "default" means any default that a court would not regard as de minimis or as having been waived by Madison on account of its failure to pursue available remedies against Bentley, despite express provisions of the guaranty specifying that: (1) it is enforceable against the guarantor "without the necessity for any suit or proceedings on Landlord's part of any kind or nature whatsoever against Tenant, without the necessity of any notice of nonpayment, non-performance or non-observance . . . or . . . of any other notice or demand to which the Guarantor might otherwise be entitled," (2) the guarantor's obligations "shall in no wise be terminated, affected, diminished or impaired by reason of the assertion, or the failure to assert, by Landlord against Tenant of any of the rights or remedies reserved to Landlord pursuant to any provisions of the Lease" and (3) the liability of the guarantor "shall in no way be affected, modified or diminished by reason of . . . any extension of time that may be granted by Landlord to Tenant, or by reason of any dealings or transaction or matter or thing occurring between Landlord and Tenant."

Even more remarkably, the majority contends not only that this meaning of the term "default" was intended by the parties, but that Madison "bears an insurmountable burden to demonstrate that the parties to the guaranty intended to ascribe a dif-

ferent meaning to the term." Regardless of whether any rational landlord seeking an unconditional guaranty of a tenant's obligations would ever assent to the technical meaning of the term "default" that the majority discovers lurking in the guaranty, Madison certainly did not. No precedent the majority cites provides an iota of support for its "interpretation" of the term "default" or Madison's supposed burden. Indeed, the majority's approach disregards virtually every rule and principle of contract interpretation the Court of Appeals identified in *Vermont Teddy Bear* (*supra*). As for the majority's belief that "simple fairness" supports its approach, it cannot be reconciled with another decision of the Court of Appeals (*Breed v Insurance Co. of N. Am.*, 46 NY2d 351, 355 [1978] ["This court may not make or vary the contract . . . to accomplish its notions of abstract justice or moral obligation"]).

Equally baseless is the majority's fear that giving the term "default" its ordinary meaning "would cast doubt on the meaning of the term [default] in all leases, removing them from the application of well-established landlord-tenant law." This fear is groundless precisely because the guaranty and the lease are separate agreements and the guaranty specifies that the Millers' obligations under the guaranty are not dependent on the ability of Madison to recover from Bentley under the lease. Even if a default by Bentley under the lease might be deemed waived by Madison, it hardly follows that such a default relieves the Millers of their obligations under the guaranty. Conversely, to recognize that Madison is entitled to performance under the guaranty on account of a default does not entail the conclusion that Madison necessarily would be entitled to relief under the lease from Bentley on account of that default.

The majority's characterization of the guaranty as a "mere collateral agreement" is perplexing. Whatever the majority means by this, it cannot alter either the unequivocal language of the guaranty or its legal status as an agreement that Madison has the right to enforce according to its terms. As this Court has recognized, "the liability of the guarantor may be broader than and exceed the scope of that of the principal where the guarantee, which is a separate undertaking, is, by its unqualified language, enforceable against the guarantor" (*Raven El. Corp. v Finkelstein*, 223 AD2d 378, 378 [1996] [citations omitted], *lv dismissed* 88 NY2d 1016 [1996]).

To be sure, the majority is correct that contractual provisions can be waived. But the issue here is not whether Madison

waived any of its rights under the lease against Bentley. The only relevant issue is whether Madison waived any of its rights under the guaranty against the Millers. Whatever might be the case under a different guaranty agreement, the guaranty expressly provides that the Millers' obligations to Madison are unaffected "by reason of any dealings or transaction or matter or thing occurring between Landlord and Tenant" and, more specifically, that it is enforceable against the Millers "without the necessity of any notice of non-payment, non-performance or non-observance . . . or . . . of any other notice or demand to which the Guarantor might otherwise be entitled."

This language alone is sufficient to compel the conclusion that Madison did not waive any of its rights under the guaranty. But there is more language in the guaranty to the same effect, including the language following the above-quoted language. After stating that the guaranty is enforceable against the Millers without the necessity of any notice or demand, it goes on to provide that the "Guarantor expressly waives" any entitlement to any such notice or demand. That the motion court and the majority nonetheless conclude that the party to the guaranty that waived its rights is Madison is no mean feat. Impressive though it is, it represents nothing more than an impermissible rewriting of the guaranty "under the guise of contract construction" (*Slatt v Slatt,* 64 NY2d 966, 967 [1985]).

The majority's conclusion about the parties' intent in entering into the guaranty is impermissible and unpersuasive. Extrinsic evidence concerning the intent of parties to a contract is not admissible when the language of the contract is clear and unambiguous (*South Rd. Assoc.,* 4 NY3d at 278).[4] But even putting that hurdle aside, the majority leaps with its "reasonable" conclusion "that the parties intended the term of the guaranty to be limited to three years unless the guarantors' obligations thereunder were actuated by landlord's *tangible loss,* whether due to the failure to receive payment of outstanding rent *or some other out-of-pocket expense*" (emphasis added). It is enough to note once again that the majority's position is utterly at odds with the terms of the guaranty. The contingent expiration provision provides that the guaranty ceases on the third anniversary "in the event Tenant shall not have been in monetary default under the Lease at any time during the first three (3) years of the Lease." The "sophisticated, counseled business

4. In relying as they do on the rent subsidy received by Bentley from Rolls-Royce, the motion court and the majority resort to extrinsic evidence.

people negotiating [the guaranty] at arm's length" (*Vermont Teddy Bear Co.*, 1 NY3d at 475) could have gone on to add a proviso to the following effect: "provided, however, that any such monetary default must result in a *tangible* loss to the Landlord that causes it to incur out-of-pocket expenses during said three (3) year period." The guaranty contains no such proviso and the majority has no authority to write it into the guaranty.[5]

The majority pummels a strawman in taxing Madison for stating "no reason why a default in the payment of rent should entail immediate adverse consequences for the tenant, even though it was ultimately cured . . . and waived." Of course, Madison's position is *not* that such a default should have any (let alone "immediate") "adverse consequences for the tenant," Bentley. Rather, Madison's position is that Bentley's repeated defaults (not a default) should have a specific consequence for the Millers: the one for which the parties to the guaranty bargained, i.e., the continuation of the guaranty beyond the third anniversary of its commencement date. The majority, not Madison, fails to answer the relevant question: how can the law ignore the unequivocal language of the guaranty specifying that it is enforceable against the Millers regardless of whether Madison waives any of its rights under the lease against Bentley? The only rational reason for Madison to have sought this language is that a court otherwise might conclude the guaranty was not enforceable against the Millers on the ground that, under landlord-tenant law (however "well-settled"), it had waived its rights against Bentley. Ironically, the guaranty's obvious purpose was to provide Madison with protection against the possibility that a court might see "no reason why a default in the payment of rent should entail . . . adverse consequences for the [Millers], even though it was ultimately cured . . . and waived."

Finally, as noted above, having obtained the guaranty from the Millers, Madison had no economic reason to paper Bentley with notices under the lease protesting Bentley's habitually late rent payments. Unsurprisingly, the majority does not posit one.

---

5. The majority's crabbed understanding of the business purpose of the guaranty ignores more than the obvious point that the late payment of rent is by no means commercially trivial (*Fifty States Mgt. Corp.*, 46 NY2d at 578). It also ignores the perhaps less obvious point discussed above that Madison well could have concluded that late rent payments from Bentley during the first three years of the lease would give it good reason to seek the protection against the loss of rent in future years afforded by a continuing guaranty.

Given the various no-waiver provisions of the guaranty, Madison had no legal reason to do so. Nonetheless, and despite these very provisions of the guaranty, the majority agrees with the motion court that Madison's failure to engage in just such a charade is fatal to its claim against the Millers. Madison need not conjure the assistance of any mythical creature to prevail; it needs only to invoke the mundane principle that contracts are to be interpreted and enforced according to their terms.

Having first raised their claims sounding in equity in their reply papers on the motion, the Millers' current arguments for "equitable intervention" are not properly before this Court and, in any event, are not relevant to the issue of whether their cross motion for summary judgment properly was granted. That motion should have been denied; accordingly, Madison's motion for leave to serve and file an amended complaint should have been granted (*see* CPLR 3025; *Cooper v Met Merchandising*, 75 AD2d 519 [1980]).

For these reasons, I would reverse, deny the cross motion for summary judgment and grant the motion for leave to serve and file an amended complaint.

MAZZARELLI, FRIEDMAN and CATTERSON, JJ., concur with TOM, J.P.; McGUIRE, J., dissents in a separate opinion.

Order, Supreme Court, New York County, entered January 10, 2005, affirmed, without costs.