[948 NYS2d 292]

ASHWOOD CAPITAL, INC., Appellant, v OTG MANAGEMENT, INC., et al., Respondents, et al., Defendants.

First Department, July 10, 2012

2

**APPEARANCES OF COUNSEL**

*K&L Gates LLP*, New York City (*Michael R. Gordon* and *Brian D. Koosed* of counsel), for appellant.

4

*Morrison & Foerster LLP*, New York City (*David J. Fioccola, Dennis P. Orr* and *Shiri Bilik Wolf* of counsel), for respondents.

**OPINION OF THE COURT**

Saxe, J.P.

■ The central issue in this appeal from the dismissal of an action for breach of contract, unjust enrichment and a declaratory judgment is the scope of the parties' 2003 written agreement regarding the right to operate concessions within the Jet-Blue terminal at John F. Kennedy Airport (JFK). We are asked to determine whether the agreement's repeated use of the term "Terminal 6" unambiguously limited the scope of the contract exclusively to the operation of concessions at Terminal 6, or whether, as plaintiff contends, the parties intended for their rights and obligations under the agreement to endure after Jet-Blue relocated to another JFK terminal. Because contract terms that are unambiguous must be enforced as written (*W.W.W. Assoc. v Giancontieri*, 77 NY2d 157, 162 [1990]), and not interpreted in some other way based on one party's assertion that "when [it] used the words, [it] intended something [other] than the usual meaning" (*Hotchkiss v National City Bank of N.Y.*, 200 F 287, 293 [SD NY 1911]), we affirm the dismissal of the claim for breach of contract.

Plaintiff Ashwood Capital, Inc. is a merchant bank, founded in 1991; Ashwood's chairman and sole stockholder, Lawrence J. Twill, Sr., is an investment banker and a businessman with more than 40 years of experience. According to Ashwood, from 1998 to 2002, Twill personally worked with nonparty JetBlue Airways Corporation (JetBlue), then a fledgling airline, to help "develop its overall customer experience" and "facilitate Jet-Blue's entry into JFK in 2000." In late 2002, JetBlue Chief Executive Officer David Barger approached Twill to seek his assistance with attracting new, higher-quality restaurants and concessionnaires to JetBlue's facilities at JFK, then located in JFK Terminal 6.

According to the complaint, finding interested concessionaires proved challenging because the Port Authority of New York and New Jersey, which operated JFK, had announced its plans to renovate and reorganize all JFK terminals over the next decade. With JetBlue's lease for Terminal 6 set to expire in November 2006, and the airlines' plans to relocate to Terminal 5 shortly thereafter, any newly-created concessions at Terminal 6 would be short-term and therefore were considered unattractive as an investment.

Twill ultimately committed his own company, Ashwood, to opening new concessions at Terminal 6. In mid-2003, Ashwood alleges, it entered into a Concessionaire Agreement with Jet-Blue, whereby Ashwood secured the rights to open three restaurants in JetBlue's Terminal 6 facilities: a Papaya King franchise, a New York-themed sports bar and grill, and a Mexican restaurant. Ashwood, however, had little interest in the day-to-day operations and wished to acquire a business partner to assume these responsibilities. On the recommendation of JetBlue's vice-president of real estate, Twill contacted defendant Eric Blatstein, then president of defendant OTG Management, Inc. (OTG),* which had been operating JetBlue's concessions in Philadelphia. Blatstein was undeterred by Jet-Blue's planned relocation and was eager to gain a foothold into JetBlue's concessions at JFK.

On December 18, 2003, Ashwood and OTG entered into a written agreement, assigning to OTG Ashwood's rights under the Concessionaire Agreement with JetBlue, namely "the right to use, for the purposes set forth therein, certain premises located at JFK International Airport, Terminal 6." Ashwood additionally agreed to provide up to twenty hours of consulting services per year to OTG "concerning the prospects for procurement and operation of additional food or liquor concessions" at "Kennedy Airport (Terminal 6)." As consideration for these rights and services, OTG agreed to pay Ashwood 1.5% of all gross sales from OTG's concessions "at Kennedy Airport, (Terminal 6)." The agreement is in the form of a letter, drafted by Ashwood, countersigned by Blatstein as president of OTG, and personally guaranteed by Blatstein as well.

Beginning in December 2003, OTG paid Ashwood 1.5% of gross sales from OTG's concessions at Terminal 6 on a monthly basis, as required under the agreement. In September 2008, however, JetBlue began operating out of its new facilities at JFK Terminal 5, having contracted with OTG to be the sole food concessionaire at the new terminal. After the closure of Terminal 6, in October 2008, OTG discontinued its monthly payments to Ashwood.

---

\* "OTG" refers to defendants OTG Management, Inc.; OTG Consolidated Holdings, Inc.; OTG Management JFK, LLC, a New York limited liability company; OTG Management JFK, LLC, a Pennsylvania limited liability company; OTG Management JFK, Inc.; OTG JFK T5 Venture, LLC; and various John Doe Entities (collectively OTG or defendants). "Defendants" also includes defendant Eric Blatstein.

Ashwood commenced this action against OTG in November 2010, seeking money damages based on allegations that (1) OTG breached the parties' agreement by failing to pay 1.5% of gross sales since November 2008; (2) Blatstein breached his guaranty; and (3) OTG is liable under the quasi-contract theory of unjust enrichment by failing to compensate Ashwood for the consulting services it provided OTG. Ashwood additionally brought a cause of action for a declaratory judgment, seeking a judicial determination of the parties' respective rights and obligations under the agreement.

Defendants moved to dismiss these claims pursuant to CPLR 3211 (a) (1) and (7). In four separate orders, two entered on July 29, 2011 and two on August 1, 2011, Supreme Court granted defendants' motion to dismiss the complaint, observing that the agreement "unambiguously limits Ashwood's rights to a percentage of Defendants' gross sales at Terminal 6."

Ashwood appeals the dismissal of its claims and, pursuant to CPLR 3211 (d), requests discovery on the issue of the parties' intent.

## Discussion

This case serves as a reminder that in order to determine the contracting parties' intent, a court looks to the objective meaning of contractual language, not to the parties' individual subjective understanding of it. As Judge Learned Hand stated:

> "A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent. If, however, it were proved by twenty bishops that either party, when he used the words, intended something else than the usual meaning which the law imposes upon them, he would still be held, unless there were some mutual mistake, or something else of the sort. Of course, if it appear by other words, or acts, of the parties, that they attribute a peculiar meaning to such words as they use in the contract, that meaning will prevail, but only by virtue of the other words, and not because of their unexpressed intent" (*Hotchkiss*, 200 F at 293).

Ashwood contends that the motion court erroneously dismissed its breach of contract claim based on an overly literal

and formalistic interpretation of the phrase "Terminal 6." According to Ashwood, the parties intended to establish a long-term business relationship, the principal goal of which was to grant Ashwood a meaningful and effective equity interest in OTG, and thereby bind the parties to the terms of their agreement well after JetBlue's relocation to Terminal 5. To accurately reflect the parties' intent, Ashwood argues, the phrase "Terminal 6" should be read to mean "any JetBlue terminal at JFK."

According to well-established rules of contract interpretation, "when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms" (*W.W.W. Assoc.*, 77 NY2d at 162). We apply this rule with even greater force in commercial contracts negotiated at arm's length by sophisticated, counseled businesspeople (*see Vermont Teddy Bear Co. v 538 Madison Realty Co.*, 1 NY3d 470, 475 [2004]; *R/S Assoc. v New York Job Dev. Auth.*, 98 NY2d 29, 32 [2002]; *Riverside S. Planning Corp. v CRP/Extell Riverside, L.P.*, 60 AD3d 61, 67 [2008], *affd* 13 NY3d 398 [2009]). In such cases, " 'courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include' " (*Vermont Teddy Bear Co.*, 1 NY3d at 475, quoting *Rowe v Great Atl. & Pac. Tea Co.*, 46 NY2d 62, 72 [1978]). "[C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing" (*Reiss v Financial Performance Corp.*, 97 NY2d 195, 199 [2001] [internal quotation marks omitted]). We instead concern ourselves "with what the parties intended, but only to the extent that they evidenced what they intended by what they wrote" (*Rodolitz v Neptune Paper Prods.*, 22 NY2d 383, 387 [1968] [internal quotation marks omitted]). Accordingly, before assessing evidence regarding what was in the parties' minds at the time of the agreement, we must first look to the agreement itself.

The primary question here is whether the parties' agreement is ambiguous; specifically, whether the phrase "Terminal 6" is "reasonably or fairly susceptible of different interpretations or may have two or more different meanings" (*New York City Off-Track Betting Corp. v Safe Factory Outlet, Inc.*, 28 AD3d 175, 177 [2006] [internal quotation marks omitted]). Whether a contractual term is ambiguous must be determined by the court as a matter of law, looking solely to the plain language used by the parties within the four corners of the contract to discern its

meaning and not to extrinsic sources (*see Kass v Kass*, 91 NY2d 554, 566 [1998]). Throughout the parties' agreement, the phrase "Terminal 6" is repeated a total of five times and consistently refers to JetBlue's facilities at JFK. In particular, the agreement specifies that OTG must pay Ashwood 1.5% "of all gross sales from concessions or food service businesses operated by OTG at Kennedy Airport, (Terminal 6)." The agreement neither mentions "Terminal 5," nor does it refer to any unspecified JetBlue terminal at JFK. We therefore agree with the IAS court that the phrase "Terminal 6" unambiguously limits the scope of the parties' agreement to concessions at JFK Terminal 6. The parties' use of the phrase "Terminal 6" is susceptible to no other interpretation.

Nor is the phrase rendered ambiguous, as Ashwood contends, by other language in the contract. Ashwood points to "future-oriented provisions" in the agreement to demonstrate an implicit long-term business relationship intended by the parties, which ostensibly would continue after JetBlue's relocation to Terminal 5. Although the agreement does give OTG the first option to acquire or operate Papaya King franchises outside of Terminal 6, OTG never exercised this option; indeed, Ashwood does not claim that it ever acquired the rights to operate Papaya King franchises either at Terminal 5 or anywhere besides Terminal 6. Ashwood's "mere assertion . . . that contract language means something other than what is clear when read in conjunction with the whole contract is not enough to create an ambiguity" (*New York City Off-Track Betting Corp.*, 28 AD3d at 177). As there is no reasonable alternative meaning for the phrase "Terminal 6," we find no ambiguity either in the term itself or when it is read in the context of the agreement as a whole.

If these commercially sophisticated and counseled parties had intended their agreement to apply to any JetBlue terminal at JFK, they could easily have expressed this intent in the language of the agreement. Indeed, both Ashwood and OTG were aware of JetBlue's upcoming relocation, yet their agreement neither mentions "Terminal 5" nor refers to any unspecified JetBlue terminal at JFK. That the agreement does not address the contingency of JetBlue's move to Terminal 5 does not, by itself, create an ambiguity. The parties omitted this contingency from their agreement, and it is not for the court to "imply a term where the circumstances surrounding the formation of the contract indicate that the parties, when the contract was

made, must have foreseen the contingency at issue and the agreement can be enforced according to its terms" (*Reiss*, 97 NY2d at 199).

Similarly absent from the agreement is any mention or implication that the parties intended to grant Ashwood an equity stake in OTG. With nothing in the written agreement to support Ashwood's contention that the parties intended for Ashwood to receive a permanent ownership interest in OTG, there is simply no basis for this Court to find an implicit long-term contractual relationship between the parties.

Furthermore, the agreement contains both a no-oral-modification clause and a broad merger clause, which as a matter of law bars any claim based on an alleged intent that the parties failed to express in writing (*see Cornhusker Farms v Hunts Point Coop. Mkt.*, 2 AD3d 201, 203-204 [2003]; *see also Torres v D'Alesso*, 80 AD3d 46, 56-57 [2010]). The merger clause specifies that the agreement "constitute[s] the full and entire understanding and agreement among the Parties," and that "no Party shall be liable or bound to any other in any manner by any representations, warranties, covenants and agreements except as specifically set forth herein and therein." Accordingly, even if Ashwood, when drafting the agreement, had understood "Terminal 6" to be an implicit reference to any JetBlue terminal at JFK, the moment the written contract became fully executed by both parties, Ashwood could not rely on that understanding, as it was not included in the mutually executed written document. Moreover, in the years since entering into the agreement, Ashwood made no attempts to amend the terms of the contract pursuant to the no-oral-modification clause.

We therefore affirm Supreme Court's dismissal of Ashwood's claim for breach of contract.

█ Nor is Ashwood entitled to discovery regarding the parties' intent pursuant to CPLR 3211 (d). Because the agreement is clear and complete on its face, "[a]ny such discovery would simply be an opportunity for plaintiff to uncover parol evidence to attempt to *create* an ambiguity in an otherwise clear and unambiguous agreement" (*RM Realty Holdings Corp. v Moore*, 64 AD3d 434, 437 [2009]). Absent a finding of ambiguity in the agreement, discovery would be unnecessary, as any parol evidence would be inadmissible (*id.*).

█ Ashwood's claim against Blatstein for breach of his guaranty falls with its breach of contract claim against OTG, since Blatstein's liability under the agreement "accrues only af-

ter default on the part of the principal obligor" (*Madison Ave. Leasehold, LLC v Madison Bentley Assoc. LLC*, 30 AD3d 1, 10 [2006] [internal quotation marks omitted], *affd* 8 NY3d 59 [2006]). Similarly, the declaratory judgment Ashwood seeks, that Ashwood is entitled to 1.5% of the gross sales from OTG's concessions in the JetBlue's Terminal 5 facilities going forward, falls with its breach of contract claim.

■ As to Ashwood's cause of action for unjust enrichment, to the extent the claim is based on the consulting services it was required to provide under the agreement "from time to time as requested with OTG . . . for procurement and operation of additional food liquor concessions at [Terminal 6]," its claim is barred. "Where the parties executed a valid and enforceable written contract governing a particular subject matter, recovery on a theory of unjust enrichment for events arising out of that subject matter is ordinarily precluded" (*IDT Corp. v Morgan Stanley Dean Witter & Co.*, 12 NY3d 132, 142 [2009]; *see also Goldman v Metropolitan Life Ins. Co.*, 5 NY3d 561, 572 [2005]). Only where the contract does not cover the dispute in issue may a plaintiff proceed upon a quasi-contract theory of unjust enrichment (*IIG Capital LLC v Archipelago, L.L.C.*, 36 AD3d 401, 405 [2007]).

■ However, the unjust enrichment claim may arguably extend beyond a claim for services that were owed pursuant to the agreement. Since we have concluded that the parties' rights and obligations under the agreement are limited to activities at Terminal 6, Ashwood's claims relating to Terminal 5 may fall outside the scope of the agreement. On a motion to dismiss we must read the complaint liberally, accept as true the facts alleged, and accord plaintiff the benefit of every possible inference (*see 511 W. 232nd Owners Corp. v Jennifer Realty Co.*, 98 NY2d 144, 151-152 [2002]). Further, we must consider the factual assertions of an affidavit submitted in opposition to the dismissal motion in order to preserve "inartfully pleaded, but potentially meritorious, claims" (*Rovello v Orofino Realty Co.*, 40 NY2d 633, 635 [1976]). Twill's affidavit elaborated on the consulting services that he, as Ashwood's principal, provided to OTG— namely, that he advised OTG to "(a) obtain financing, rather than have Mr. Blatstein continue to give away equity in the company in exchange for funding; (b) replace its first two Chief Financial Officers; and (c) raise the quality of its concessions in order to attract more—and more lucrative—customers." Twill also claims that he "regularly encouraged George Sauer, Jet-

Blue's Vice-President of Real Estate, to give OTG more concession space and to grow OTG's business at both Terminal 5 and Terminal 6. I also devised the business strategy for OTG." As these services fall outside the scope of the agreement, the contract does not completely bar Ashwood's cause of action for unjust enrichment.

■ However, the statute of frauds bars any unjust enrichment claim based on the assertion that Twill acted as an intermediary between JetBlue and OTG during negotiations over OTG's right to operate JetBlue's concessions at Terminal 5 (see General Obligations Law § 5-701 [a] [10]). Without a writing, an alleged agreement, promise or undertaking is unenforceable under section 5-701 (a) (10), if it "[i]s a contract to pay compensation for services rendered in negotiating . . . a business opportunity . . . 'Negotiating' includes procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction." The statute of frauds applies "where . . . the intermediary's activity is . . . that of providing . . . 'know-who', in bringing about between principals an enterprise of some complexity" (Snyder v Bronfman, 13 NY3d 504, 510 [2009] [internal quotation marks omitted]).

Yet, Ashwood's unjust enrichment claim does not fall entirely within the scope of section 5-701 (a) (10), as Ashwood also seeks compensation for Twill's advice to OTG regarding financing, its chief executive officers, and raising the quality of its concessions. Therefore, dismissal of Ashwood's unjust enrichment claim in its entirety at this juncture was premature.

We have considered plaintiff's remaining arguments and find them to be without merit.

Accordingly, the orders of the Supreme Court, New York County (Charles E. Ramos, J.), entered July 29, 2011 and August 1, 2011, which granted defendants' motion to dismiss the complaint pursuant to CPLR 3211 (a) (1) and (7), should be modified, on the law, to deny the motion as to the cause of action for unjust enrichment to the extent plaintiff claims to have provided services beyond those mentioned in the parties' contract and those having to do with brokering or negotiating a deal between OTG and nonparty JetBlue for OTG's operation of JetBlue's concessions at Terminal 5, and otherwise affirmed, without costs.

SWEENY, RENWICK, DEGRASSE and RICHTER, JJ., concur.

Orders, Supreme Court, New York County, entered July 29, 2010 and August 1, 2010, modified, on the law, to deny the motion as to the cause of action for unjust enrichment to the extent plaintiff claims to have provided services beyond those mentioned in the parties' contract and those having to do with brokering or negotiating a deal between OTG and nonparty JetBlue for OTG's operation of JetBlue's concessions at Terminal 5, and otherwise affirmed, without costs.